TICKETMASTER–NEW YORK,
INC., Plaintiff, Appellant,

v.

Joseph M. ALIOTO, Defendant, Appellee.

No. 93–1692.

United States Court of Appeals,
First Circuit.

Heard Dec. 10, 1993.

Decided April 13, 1994.

Jonathan W. Lubell, with whom Malcolm I. Lewin, Frank McClain–Sewer, Morrison Cohen Singer & Weinstein, New York City, Stephen R. Wainwright, and Wainwright, Wainwright, Wainwright, Wainwright & Wainwright, Brockton, MA,were on brief, for appellant.

James A.G. Hamilton, with whom Theodore F. Schwartz, Jerry Cohen, and Perkins, Smith & Cohen, Boston, MA, were on brief, for appellee.

Before TORRUELLA, SELYA and STAHL, *Circuit Judges.*

SELYA, *Circuit Judge.*

This case probes the frontiers of the doctrine of personal jurisdiction in a context fraught with constitutional implications. The issue, simply put, is this: Can a Massachusetts–based court, consistent with the Due Process Clause, assert jurisdiction over a California resident who is alleged to have made a defamatory comment during an unsolicited telephone interview with a staff reporter for a Massachusetts newspaper? We conclude, on the facts of this case, that the lower court correctly disclaimed jurisdiction.

## I. BACKGROUND

Inasmuch as the district court dismissed this suit for failure of the plaintiff to make a *prima facie* jurisdictional showing, *see Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 675 (1st Cir.1992), we draw the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by plaintiff as true and construing disputed facts in the light most hospitable to plaintiff. Of course, we do not credit conclusory allegations or draw farfetched inferences. *See generally Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 16 (1st Cir.1989) (discussing line between "facts" and "conclusions" for purposes of a motion to dismiss).

Defendant-appellee Joseph M. Alioto is an attorney practicing in California. Among his other cases, Alioto is pressing a class action in the California courts against Ticketmaster–Southern California, Inc. (T–SC). T–SC, a California-based corporation, is affiliated with Ticketmaster–New York, Inc. (T–NY), a Delaware corporation. Both Ticketmaster entities are engaged in the business of selling ducats to entertainment events.

The litigation between T–NY and Alioto finds its genesis in the decision by the *Boston Globe,* a daily newspaper, to undertake an investigation into pricing practices on "Ticketmaster's" part.[1] In conducting this investigation, a *Globe* reporter conversed by telephone with Alioto. The plaintiff does not allege, and the record does not suggest, that Alioto dialed the telephone or otherwise initiated the call. The record is equally barren of any showing that Alioto solicited the inquiry[2] or that more than one call occurred. It is clear, nevertheless, that Alioto, who was in California, knew when speaking that his comments would inform a story slated for publi-

---

1. The article that capped this investigation makes no attempt to distinguish among corporate entities (although it contains one vague reference to "Ticketmaster and its affiliates"). At no point does the article refer by name to either T–NY or T–SC.

2. Although there is a passing allusion in the record to a press release issued by Alioto regarding the lawsuit against T–SC, there is no indication that he forwarded this release to Massachusetts or that it sparked the *Globe*'s story.

cation in a newspaper circulated chiefly in Massachusetts.

The investigation culminated in a front-page expose that hit the newsstands on Sunday, September 20, 1992, under the banner headline, "Rising ticket fees pad concert profits." The ensuing article contained over fifty paragraphs. Well past the midpoint, the article mentioned mounting complaints about price gouging in New York and California. It then reported that "three class action antitrust lawsuits" had recently been filed "against Ticketmaster" in California. There followed the paragraph around which this controversy revolves (buried deep in the body of the article). We quote the allegedly offending paragraph in full, and, in the interests of context, add the beginning of the following paragraph.

> Attorney Joseph M. Alioto, who filed one of the suits, charged that kickbacks are the key to Ticketmaster's California monopoly. "They're nothing more than a straight bribe," he said.

> Ticketmaster and its affiliates took on their California adversaries in typical aggressive fashion, . . .

Based on this reported comment, T–NY brought suit against Alioto in the United States District Court for the District of Massachusetts. Invoking diversity jurisdiction, 28 U.S.C. § 1332 (1988), it alleged that Alioto, with the requisite intent, conveyed and/or caused to be conveyed certain defamatory impressions of and concerning T–NY, namely, that T–NY engaged in bribery and related criminal conduct.

In due season, Alioto moved to dismiss. T–NY objected. The district judge heard oral argument and dismissed the action for lack of *in personam* jurisdiction, concluding that appellant failed to make the requisite showing at every stage of the obligatory jurisdictional inquiry under the due process clause. *See United Electrical Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1089 (1st Cir.1992) (*Pleasant St. I* ) (discussing nature

of requisite inquiry). Two perceptions figured prominently in the district court's reasoning. First, the defendant did not actively shape and focus the reporter's story, but, rather, passively responded to a telephone call. Second, the allegedly defamatory comment dealt with the California activities of a California corporation, T–SC, and did not pertain to T–NY.

■ Plaintiff appeals. Because the court below dismissed the case on legal grounds, without convening an evidentiary hearing or resolving contested evidentiary questions, appellate review is plenary. *See United Electrical Workers v. 163 Pleasant St. Corp.,* 987 F.2d 39, 43–44 (1st Cir.1993) (*Pleasant St. II* ); *Boit,* 967 F.2d at 675. In conducting this tamisage, we are not wedded to the district court's rationale, but remain free to affirm the judgment below on any independently sufficient ground made manifest by the record. *See Martel v. Stafford,* 992 F.2d 1244, 1245 (1st Cir.1993).

## II. ANALYSIS

■ To subject a non-resident defendant to its jurisdiction in a diversity case, a court—and for this purpose, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state, *see General Contracting & Trading Co. v. Interpole, Inc.,* 940 F.2d 20, 23 n. 4 (1st Cir.1991)—must find contacts that, in the aggregate, satisfy the requirements of both the forum state's long-arm statute and the Fourteenth Amendment.[3] *See Pleasant St. I,* 960 F.2d at 1086 ("In Massachusetts, a court may exercise personal jurisdiction over a foreign defendant if such jurisdiction is authorized by state statute or rule *and* its exercise does not offend due process."); *Bond Leather Co. v. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 931 (1st Cir.1985) (similar). The district court determined that T–NY satisfied neither of these two prerequisites. We explore these determinations.

---

3. To be sure, the extent of the necessary jurisdictional showing varies depending upon whether a litigant asserts jurisdiction over an adverse party under a theory of "general" or "specific" jurisdiction. *See Donatelli v. National Hockey* *League,* 893 F.2d 459, 462–63 (1st Cir.1990) (elucidating standards and enumerating differences). Here, plaintiff's case stands or falls on a theory of specific jurisdiction.

## A. *The State Statute.*

The applicable Massachusetts statute, familiarly known as "section 3(c)," deals with torts committed by persons who have no ongoing relationship with the forum state. The language of this provision tracks the Uniform Interstate and International Procedure Act, and differs significantly from other leading formulations. *See Murphy v. Erwin–Wasey, Inc.,* 460 F.2d 661, 663–64 (1st Cir.1972); *see also Margoles v. Johns,* 483 F.2d 1212, 1216 (D.C.Cir.1973). The statute states:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ...
>
> (c) causing tortious injury by an act or omission in this Commonwealth....

Mass.Gen.Laws ch. 223A, § 3 (1986).

Although the lower court did not reach the question of jurisdiction under state law, we have pondered whether the case might more appropriately be dispatched on that basis. After all, "[i]t has long been a basic tenet of the federal courts to eschew the decision of cases on constitutional grounds unless and until all other available avenues of resolution [have been] exhausted." *Aggarwal v. Ponce Sch. of Medicine,* 745 F.2d 723, 726 (1st Cir.1984). But here, as we explain below, the state-law issues are extremely murky. Thus, on balance, we agree with the district court that it makes sense to resolve the jurisdictional question on constitutional grounds.

In the first place, although logic suggests that, on these facts, the defendant cannot be said to have performed "an act" in Massachusetts, that suggestion is not easily reconciled with *Murphy.* There, we ruled that an allegedly tortious act committed outside the borders of Massachusetts, purposefully directed at the state and intended to cause injury there, could constitute an in-forum act within the meaning of section 3(c). *See Murphy,* 460 F.2d at 664. While *Murphy* can be distinguished on the ground that it was decided in the context of fraudulent misrepresentation, as opposed to defamation,[4] its interpretation of section 3(c) is worded in general terms and its reasoning conceivably could be transferred to the defamation context. Despite our profound reservations about extending the *Murphy* rationale,[5] it spreads a shadow of uncertainty over the state-law issues.

In the second place, because we are skeptical that defendant made any remark "of and concerning" T–NY, we harbor doubts whether defendant can be said to have inflicted any "tortious injury" within the meaning of section 3(c).[6] We are, however, hesitant to move beyond an expression of skepticism. At this stage of the proceedings, appellant has not had the benefit of an evidentiary

---

**4.** Appellant argues that we have already extended *Murphy* to the defamation arena in *Hugel v. McNell,* 886 F.2d 1 (1st Cir.1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1808, 108 L.Ed.2d 939 (1990). We do not think *Hugel* must necessarily be read so broadly. That case turned on a construction of the New Hampshire long-arm statute, N.H.Rev.Stat.Ann. § 510:4 (1993), and the New Hampshire statute, unlike its Massachusetts counterpart, does not embody the language of the Uniform Act.

**5.** Intuitively, it would seem hard to characterize the act of publishing an allegedly defamatory remark outside the forum state as an act within the forum state. In fact, no fewer than five courts applying long-arm statutes patterned after the Uniform Act have eschewed *Murphy*'s reasoning in the defamation context and declined to assert jurisdiction on this basis. *See Reuber v. United States,* 750 F.2d 1039, 1049 (D.C.Cir. 1984); *Dietrich v. Wisconsin Patients Comp. Fund,* 169 Wis.2d 471, 485 N.W.2d 614, 617–18

(1992); *Wheeler v. Teufel,* 443 N.W.2d 555, 558 (Minn.Ct.App.1989); *Ramada Inns, Inc. v. Drinkhall,* No. 83C–AU–56, 1984 WL 247023, unpaginated slip op. available on LEXIS (Del.Super.Ct.1984); *Zinz v. Evans & Mitchell Indus., Inc.,* 22 Md.App. 126, 324 A.2d 140, 144 (1974); *see also St. Clair v. Righter,* 250 F.Supp. 148, 151 (W.D.Va.1966) (using similar reasoning to interpret long-arm statute containing "tortious act" language); *see generally Margoles,* 483 F.2d at 1218–19 (criticizing *Murphy*'s interpretation of language drawn from the Uniform Act).

**6.** In Massachusetts, a court has power to determine, as a matter of law, that a particular remark is not susceptible of any defamatory construction "of and concerning" the plaintiff, and, therefore, not actionable. *See Eyal v. Helen Broadcasting Corp.,* 411 Mass. 426, 583 N.E.2d 228, 232 (1991). At least one court has used this type of power to dismiss a defamation case on jurisdictional grounds. *See Wyatt v. Kaplan,* 686 F.2d 276, 282 (5th Cir.1982).

hearing or a comparable opportunity (say, access to the full-dress summary judgment protocol after a reasonable period of discovery) for presenting proof. Thus, it may be too early to reach the state-law issues.

To be sure, our reservations about one or both of these points might well be resolved upon closer perscrutation. But there is no need to sally forth. Because it is apodictic that a jurisdiction-seeking plaintiff must satisfy the demands of not only state law but also the federal Constitution, *see Pleasant St. I,* 960 F.2d at 1086, and because T–NY's case cannot pass constitutional muster, we choose to bypass the statutory phase of the jurisdictional inquiry. Consistent with this approach, we accept appellant's alleged facts as true for present purposes and assume *arguendo* that the allegedly defamatory remark concerned T–NY.

### B. *The Due Process Clause.*

 Divining personal jurisdiction is "more an art than a science." *Donatelli v. National Hockey League,* 893 F.2d 459, 468 n. 7 (1st Cir.1990).[7] In broad outline, a party wishing to validate a court's jurisdiction must show that "minimum contacts" exist between the defendant and the forum state. *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). To establish minimum contacts on a theory of specific jurisdiction, a plaintiff must first demonstrate that its cause of action "arises out of, or relates to" defendant's contacts with the forum state, *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). Then, the plaintiff must demonstrate the deliberateness of the defendant's contacts, or, phrased another way, that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

Even if a plaintiff succeeds in making these two showings, it is not home free. The defendant may nonetheless avoid having to defend in a strange place if it can establish that allowing the suit to go forward would be inconsistent with "fair play and substantial justice," *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160.

Following this analytic model, we first assess relatedness and purposeful availment in terms of their applicability to the case at hand. Finding them to be inconclusive in this rather odd situation, we then mull the extent to which considerations of fairness and substantial justice must influence our ultimate decision.

*1. Relatedness.* The requirement that a suit arise out of, or be related to, the defendant's in-forum activities comprises the least developed prong of the due process inquiry. *See Pleasant St. I,* 960 F.2d at 1089 & n. 9; *see also Carnival Cruise Lines v. Shute,* 499 U.S. 585, 589, 111 S.Ct. 1522, 1525, 113 L.Ed.2d 622 (1991) (declining to reach issue despite having certified it for review). We know to a certainty only that the requirement focuses on the nexus between the defendant's contacts and the plaintiff's cause of action.

The Court has kept its own counsel on the question of whether, on the one hand, the two halves of the relatedness requirement are merely two ways of expressing the same thought or, on the other hand, they are meant to import different values into the jurisdictional equation. *See Helicopteros,* 466 U.S. at 415 n. 10, 104 S.Ct. at 1872 n. 10 (reserving question). For our part, we think it significant that the constitutional catchphrase is disjunctive in nature, referring to suits "aris[ing] out of, *or* relat[ing] to," in-forum activities. *Id.* at 414, 104 S.Ct. at 1872 (emphasis supplied). We believe that this added language portends added flexibility and signals a relaxation of the applicable standard. A number of other courts share this belief. *See, e.g., City of Virginia Beach v. Roanoke River Basin Ass'n,* 776 F.2d 484, 487 (4th Cir.1985); *Southwire Co. v. Trans–World Metals & Co.,* 735 F.2d 440, 442 (11th Cir.1984); *Thos. P. Gonzalez Corp. v. Conse-*

---

7. In *Donatelli,* 893 F.2d at 462–65, we chronicled the historical development of due process standards for personal jurisdiction, and in *Pleas-* *ant St. I,* 960 F.2d at 1089, we rehearsed the current state of the law.

*jo Nacional de Produccion,* 614 F.2d 1247, 1254 (9th Cir.1980); *see also In re Oil Spill by the Amoco Cadiz,* 699 F.2d 909, 915 (7th Cir.1983).

■ While we do not have occasion today to give fuller content to the relatedness requirement,[8] it is evident that the requirement serves two functions. First, relatedness is the divining rod that separates specific jurisdiction cases from general jurisdiction cases. Second, it ensures that the element of causation remains in the forefront of the due process investigation. Even if the facts are such that a court may not dismiss a given case for lack of relatedness *per se,* the relatedness requirement, in serving its second function, authorizes the court to take into account the strength (or weakness) of the plaintiff's relatedness showing in passing upon the fundamental fairness of allowing the suit to proceed.

■ In this vein, it is important to recognize that, when the defendant in a defamation action is a journalist's source, the link between the defendant's conduct and the cause of action is attenuated by the intervening activities of third parties, *e.g.,* the reporter, the editor, the media outlet, and that those intermediaries shape, amplify, and occasionally distort the original utterance. This case illustrates the point. The original comment, technically a tort in its own right (if defamatory), inflicted no significant injury, except insofar as it led to republication in the ensuing newspaper article—and the form and tone of the republication was not by any stretch of the most active imagination within the defendant's effective control.

■ **2. *Purposeful Availment.*** The question here must be phrased in terms of whether an individual who merely answers a telephone call, but, having done so, knowingly directs his comments into the forum state, may be said to have purposefully availed himself of the privilege of conducting activities in the state.[9]

To answer the question, we begin by considering *McBreen v. Beech Aircraft Corp.,* 543 F.2d 26 (7th Cir.1976), a case that the district court thought highly pertinent and that Alioto touts as dispositive. There, the Seventh Circuit refused to sanction the exercise of jurisdiction because the defendant, a journalistic source, did not initiate the defamatory exchange, and, being unaware of either the reporter's whereabouts or the magazine's reach, could not reasonably have foreseen that his comment would cause injury in the forum state. *See id.* at 28.

■ The two conditions identified as salient in *McBreen* correspond to the two cornerstones of purposeful availment. One cornerstone is foreseeability. *See, e.g., Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 905 (1st Cir.1980); *see also World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (stating that, for a court to assert jurisdiction, a defendant's "conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there"). The second cornerstone, less frequently recognized as such, is voluntariness. *See Vencedor Mfg. Co. v. Gougler Indus., Inc.,* 557 F.2d 886, 891 (1st Cir.1977); *see also Burger King Corp. v.*

---

8. At least one scholar reads a line of First Circuit cases as going beyond this point and proposing an innovative constitutional test. *See* Mark M. Maloney, *Specific Personal Jurisdiction and the "Arise From or Relate to" Requirement ... What Does it Mean?* 50 Wash. & Lee L.Rev. 1265, nn. 118–130 & accompanying text (1993). In our view, these cases—which interpret the term "arising from" as that term is used in the long-arm statutes of Massachusetts, *see Fournier v. Best Western Treasure Island Resort,* 962 F.2d 126, 127 (1st Cir.1992); *Marino v. Hyatt Corp.,* 793 F.2d 427, 430 (1st Cir.1986), and Puerto Rico, *see Pizarro v. Hoteles Concorde Int'l, Inc.,* 907 F.2d 1256, 1259–60 (1st Cir.1990)—deal with state-law issues and have no real implica-

tions for the relatedness requirement specifically or for constitutional analysis generally.

9. Appellant's efforts to reframe this question by hinting that Alioto instigated the call are unavailing. The burden of proving jurisdictional facts rests on the shoulders of the party who seeks to invoke the court's jurisdiction. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Martel,* 992 F.2d at 1247 n. 5; *Pleasant St. I,* 960 F.2d at 1090. On this principle, and in the absence of even a representation or firm allegation to the contrary, we must presume, as did the court below, that Alioto played no part in initiating the telephone call.

*Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (cautioning that jurisdiction may not rest ·on the "unilateral activity of another party or a third person"). In *McBreen,* these two cornerstones were poorly laid: a failed showing of foreseeability and a questionable showing of voluntariness combined to form an insufficiently sturdy foundation to support *in personam* jurisdiction. The instant case, which amalgamates an arguably successful showing of foreseeability with a dubious showing of voluntariness, is a closer call. We turn, then, to a broader survey of analogous case law.

Courts are consentient that when, as in *McBreen,* the source of an allegedly defamatory remark did not initiate the pivotal contact, and the in-forum injury is not reasonably foreseeable, jurisdiction may not be asserted over the source based on the comment.[10] *See, e.g., Madara v. Hall,* 916 F.2d 1510, 1517–19 (11th Cir.1990); *Mann v. Tom James Co.,* 802 F.Supp. 1293, 1296–97 (E.D.Pa.1992). However, when the source takes the initiative and causes foreseeable injury, jurisdiction may lie. *See, e.g., Brown v. Flowers Indus., Inc.,* 688 F.2d 328, 333–34 (5th Cir.1982); *Rusack v. Harsha,* 470 F.Supp. 285, 291 (M.D.Pa.1978); *Fallang v. Hickey,* 40 Ohio St.3d 106, 532 N.E.2d 117, 118–19 (1988); *see also supra* note 10 and cases discussed therein.

This case falls between the stools, for, although the source did not initiate the contact, the resultant in-forum injury was foreseeable. In this posture, the authorities are divided. Two courts have declined jurisdiction under such circumstances. *See Nation-*

al Ass'n of Real Estate Appraisers v. Schaeffer, Bates & Co., 1989 WL 267762, at *1, *4, 1989 U.S.Dist. LEXIS 3098, at *2, *10 (C.D.Cal. Mar. 23, 1989) (refusing to assert jurisdiction over a Rhode Island source for comments made in the course of responding to a telephone call from a reporter for a California newspaper); *McDonald v. St. Joseph's Hosp.,* 574 F.Supp. 123, 124, 126–27 (N.D.Ga.1983) (similar; individual defendant answered several telephone calls from a hospital interested in employing plaintiff, and made allegedly defamatory remarks with full knowledge of their potential consequences). At least one other court has asserted jurisdiction in such a situation. *See Dion v. Kiev,* 566 F.Supp. 1387, 1388–90 (E.D.Pa.1983) (exercising jurisdiction over a New York defendant who answered a telephone call from a reporter for a Philadelphia newspaper). Other straws in the decisional wind blow in differing directions.[11] *Compare, e.g., Berrett v. Life Ins. Co. of the Southwest,* 623 F.Supp. 946, 950 n. 3 (D.Utah 1985) (declining to assert jurisdiction, discussing *McBreen,* and treating the fact that the defendant did not initiate the contact as dispositive) *with, e.g., Cole v. Doe,* 77 Mich.App. 138, 258 N.W.2d 165, 168 (1977) (upholding jurisdiction, without any discussion of initiation, where a source, able to foresee republication in the forum state, made an allegedly defamatory remark in a telephone interview with a nationally syndicated columnist).

■ Having found the case law in a muddle, we consider appellant's invitation that we adopt the classic analogy for an out-of-state libel: the gunman firing across a state line.

---

**10.** Appellant characterizes *Hugel v. McNell,* 886 F.2d 1 (1st Cir.1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1808, 108 L.Ed.2d 939 (1990), and *Advanced Dictating Supply, Inc. v. Dale,* 269 Or. 242, 524 P.2d 1404 (1974), as cases in which courts asserted jurisdiction even though defamatory exchanges were initiated by persons other than the defendants. We reject the characterization. Our opinion in *Hugel,* read in context, makes it clear that the defendants played an active role, meeting repeatedly with journalists and supplying them with audiotapes and other information. *See Hugel,* 886 F.2d at 2–3. The *Advanced Dictating* court likewise found sufficient evidence to conclude that the defendants incited the reporter's telephone call. *See Advanced Dictating,* 524 P.2d at 1406–07.

**11.** In examining the case law, we have considered—and rejected—appellant's suggested analogy to a line of fraudulent misrepresentation cases. *See, e.g., Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978, 982 (1st Cir.1986); *Murphy,* 460 F.2d at 663–64; *Johnson v. Witkowski,* 30 Mass.App. Ct. 697, 573 N.E.2d 513, 523 (1991); *Burtner v. Burnham,* 13 Mass.App.Ct. 158, 430 N.E.2d 1233, 1236 (1982). These cases are unhelpful because a business relationship almost invariably entails some degree of initiative and forethought on the part of the persons involved, and, therefore, initiation and foreseeability are necessarily present.

*See Buckley v. New York Post Corp.,* 373 F.2d 175, 179 (2d Cir.1967). In a situation like this one, the analogy is imperfect. The person who responds to a journalist's question in the course of an interview initiated by the latter is less like a traditional sniper and more like a person who has been transported to the border and eased into position behind a rifle aimed at a pre-selected target. While such a person retains the choice of pulling the trigger, or not, he cannot fairly be equated with an individual who has achieved the same position through a series of personalized affirmative choices reaffirmed at every significant juncture.[12]

The conclusion that we draw from this line of reasoning is that appellant has made only the most marginal of showings that Alioto purposefully availed himself of an opportunity to act in Massachusetts. And the weakness of this showing assumes decretory significance when we step back and evaluate the fairness of asserting jurisdiction in the totality of the circumstances.

3. *The Gestalt Factors.* In constitutional terms, the jurisdictional inquiry is not a mechanical exercise. The Court has long insisted that concepts of reasonableness must inform a properly performed minimum contacts analysis. *See, e.g., Woodson,* 444 U.S. at 292, 100 S.Ct. at 564; *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160. "This means that, even where purposefully generated contacts exist, courts must consider a panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal." *Pleasant St. I,* 960 F.2d at 1088; *accord Donatelli,* 893 F.2d at 464-65. The Supreme Court has identified five such factors, namely, (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *See Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184.

We have labelled this group of considerations the "gestalt factors." *See Pleasant St. I,* 960 F.2d at 1088; *Donatelli,* 893 F.2d at 465.

The gestalt factors are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice. In very close cases, they may tip the constitutional balance. *See Burger King,* 471 U.S. at 477-78, 105 S.Ct. at 2184-85 (explaining that "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities") (citation omitted). For example, in *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), eight Justices agreed that asserting jurisdiction would be unreasonable, although the question of minimum contacts was so close that it divided the Court. *See id.* at 114-15, 107 S.Ct. at 1033-34. In the estimation of at least four Justices, considerations of reasonableness sufficed to defeat jurisdiction notwithstanding that the defendant purposefully engaged in activities within the forum. *See id.* at 116-17, 107 S.Ct. at 1034-35 (separate opinion of Brennan, J., joined by White, Marshall, & Blackmun, JJ.). Justice Stevens, although not joining Justice Brennan's concurrence, expressed satisfaction with the theory underlying this conclusion. *See id.* at 121-22, 107 S.Ct. at 1036-37 (separate opinion of Stevens, J.).

This aspect of the jurisdictional inquiry remains something of an unknown quantity. The gestalt factors have been applied by the Court only once (in *Asahi* ); beyond mere mention, they have been discussed on rare occasions by the courts of appeals, *see, e.g., Gould v. Krakatau Steel,* 957 F.2d 573, 576 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Theunissen v. Matthews,* 935 F.2d 1454, 1460-61 (6th Cir.1991), and they have been used regularly to defeat jurisdiction only in the Ninth Circuit, *see* Mona A. Lee, *Burger King's Bifur-*

---

**12.** Withal, we recognize that a person speaking on the telephone is free to refrain from making defamatory statements in the same way that a person standing beside a telephone is free to refrain from calling a reporter. In terms of moral philosophy, both persons, by acting, commit acts of will.

*cated Test for Personal Jurisdiction*, 66 Temp.L.Rev. 945 (1993) (surveying circuits). That circuit has concluded that dismissal may be appropriate on grounds of reasonableness even if considerations of relatedness or purposefulness, taken in isolation, could support the exercise of jurisdiction. *See Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 302 (9th Cir.1986) (finding the assertion of jurisdiction unreasonable though the showing of purposefulness was "certainly of a nature that would support jurisdiction"); *see also FDIC v. British–American Ins. Co.*, 828 F.2d 1439, 1442 (9th Cir.1987) (collecting cases in which courts denied jurisdiction for lack of reasonableness without resolving questions anent relatedness and purposefulness); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir.1986) (limning Ninth Circuit's multi-factor reasonableness test).

■■■ We agree in principle with the Ninth Circuit. We hold, therefore, that the Due Process Clause bars a court from asserting jurisdiction over the person of a defendant if doing so would be fundamentally unfair. In this context, gauging fairness requires an assessment of reasonableness for, in certain circumstances, unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness. We think, moreover, that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness. *See Donatelli*, 893 F.2d at 465. It is against this backdrop, then, that we proceed to sift the gestalt factors.[13]

■■■ **a. *The Burden of Appearance.*** The burden associated with forcing a Califor-

nia resident to appear in a Massachusetts court is onerous in terms of distance, and there are no mitigating factors to cushion that burdensomeness here. This burden, and its inevitable concomitant, great inconvenience, are entitled to substantial weight in calibrating the jurisdictional scales. Indeed, the Court has stated that this element, alone among the gestalt factors, is "always a primary concern." *Woodson*, 444 U.S. at 292, 100 S.Ct. at 564.

These are not empty words, for most of the cases that have been dismissed on grounds of unreasonableness are cases in which the defendant's center of gravity, be it place of residence or place of business, was located at an appreciable distance from the forum. *See, e.g., Asahi*, 480 U.S. at 114, 107 S.Ct. at 1033 (Japanese defendant sued in California); *Core–Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488–90 (9th Cir.1993) (Swedish defendant sued in California; defamation action); *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 852 (9th Cir.1993) (Filipino defendant sued in Washington); *Casualty Assur. Risk Ins. Brokerage Co. v. Dillon*, 976 F.2d 596, 600 (9th Cir.1992) (District of Columbia defendant sued in Guam; defamation action); *Fields*, 796 F.2d at 302 (British defendant sued in California). The effect of distance on jurisdictional outcomes is graphically illustrated by the two cases in which a defendant's contacts with the forum were most strikingly reminiscent of those that have been assembled here. *Compare National Ass'n of Real Estate Appraisers*, 1989 WL 267762 at *4, 1989 U.S.Dist. LEXIS at *11 (declining to assert jurisdiction over Rhode Island defendant who would have had to defend defamation suit in California) *with Dion*, 566 F.Supp. at 1387 (asserting jurisdiction over New York defendant forced to defend defamation suit in Pennsylvania).

Furthermore, as the court below observed, the circumstances surrounding this case sug-

---

**13.** The approach that we endorse today differs slightly from that of the Ninth Circuit, which has crafted its own version of a sliding scale approach. The Ninth Circuit's methodology, as we understand it, incorporates the element of purposefulness into the third prong of the inquiry, and weighs it against the remaining consider-

ations of reasonableness. *See Core–Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993); *see also Insurance Co. of North Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1271 (9th Cir.1981) ("The smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise.").

gest that the inconvenience to the defendant may not be coincidental. It is the rare libel case in which both the newspaper and the reporter, though amenable to process, are relegated to the sidelines at the behest of an avowedly defamed plaintiff. It is rarer still to discover that such a plaintiff has intentionally selected a forum in which punitive damages are unavailable, bypassing other fora in which such damages might be awarded.

Such considerations are important. One reason that the factor of inconvenience to the defendant weighs heavily in the jurisdictional balance is that it provides a mechanism through which courts may guard against harassment. It is firmly settled that a "plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) (citations omitted). And although vexatious suits are more frequently dismissed under the doctrine of *forum non conveniens*, we believe that the reasonableness analysis required by the third prong of the due process inquiry must be in service to the same ends.

**■ b. *Interest of the Forum.*** The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984). Though we deem it inappropriate to correlate the strength or weakness of appellant's case on the merits with the strength or weakness of the forum state's interest in this regard, we think it is both appropriate and useful to note two special considerations. First, the Commonwealth's interest in the litigation *sub judice* is arguably lessened by the doubts surrounding whether defendant's act can be said to have been committed in the forum, *see supra* p. 205. Second, if appellant in fact filed suit primarily to retaliate against Alioto's role in the California litigation rather than to right an independent wrong—and as previously mentioned there are some clues in the record that could lead to such a deduction—the Commonwealth's interest would be

much diminished. *Cf., e.g., Asahi*, 480 U.S. at 114–15, 107 S.Ct. at 1033–34 (minimizing forum state's interest in protecting its citizens from tortious injury because a dispute was "primarily about indemnification rather than safety standards"). Mindful of these special considerations, we conclude that the forum has a milder than usual interest in the further prosecution of T–NY's suit.

**■ c. *The Plaintiff's Convenience.*** Given the sparseness of the record, it is difficult to say whether trying the case in Massachusetts would be more convenient for plaintiff than trying it in California. Certain key witnesses on the issue of injury may be in Massachusetts, including the reporter. But other key witnesses may well be residents of California. While we must accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience, *see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981), the plaintiff's *actual* convenience seems to be at best a makeweight in this situation.

**■ d. *The Administration of Justice.*** Apart from the possibility that plaintiff's action might be thought vexatious, *see supra* Part II(B)(3)(a), the interest of the judicial system in the effective administration of justice does not appear to cut in either direction.

**■ e. *Pertinent Policy Arguments.*** One substantive social policy that seems to counsel against exercising jurisdiction is the widely shared interest in preserving citizens' willingness to talk openly with the press. Forcing an individual to fly cross-country on the strength of one answered telephone call from a journalist likely would tend to dry up sources of information and thereby impede the press in the due performance of its proper function. Nonetheless, the Court has shied away from allowing First Amendments concerns to enter into the jurisdictional analysis. *See Keeton*, 465 U.S. at 780 n. 12, 104 S.Ct. at 1481 n. 12; *Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984). Although it might be argued convincingly that the jurisdictional calculus ought to produce somewhat different results in defa-

mation actions filed against reporters' sources than in actions filed against the journalists responsible for republication of a source's remark, as in *Calder,* or against the media corporation itself, as in *Keeton,* these precedents give us pause. Consequently, we place no weight on First Amendment values for purposes of this appeal.

**4. *Tallying the Results.*** We begin the final phase of our analysis by retracing our steps. At the first stage of the due process inquiry, appellant succeeded in showing that its putative cause of action arose from, or related to, defendant's contacts with the forum. *See supra* Part II(B)(1). At the second stage of the inquiry, appellant succeeded in showing defendant's purposeful availment. *See supra* Part II(B)(2). On neither prong, however, did appellant demonstrate more than a bare minimum; we found its claim of relatedness enfeebled by the attenuated causal link between the allegedly defamatory utterance and the harm allegedly suffered, and its claim of purposefulness enfeebled by the fact that the defendant did not initiate either the telephone call or the resultant interview.

■ The frailty of appellant's showings on the first two furcula of the due process inquiry required us to consider the gestalt factors and assess the reasonableness of an assertion of jurisdiction by a Massachusetts court. Doing so, *see supra* Part II(C), we found that, while many of those factors possess little significance for purposes of this case, there is one factor—the defendant's convenience—that stands out from the crowd. It is this factor that consistently has been declared deserving of the greatest weight in kindred cases. And it is this factor that may serve as an amulet to ward off vexatiousness and harassment. We now conclude, considering the totality of the circumstances, that defendant's burden of appearance is so onerous that it renders the exercise of *in personam* jurisdiction unreasonable. This conclusion carries the day. A distant court cannot constitutionally exercise *in personam* jurisdiction over a non-resident defendant at the behest of a plaintiff who can muster only the most tenuous showings of relatedness and purposefulness if, as in this case, forcing the defendant to defend in the forum would be plainly unreasonable.

This is as it should be, for, at bottom, the dictates of due process demand that a court's assertion of *in personam* jurisdiction comport with considerations of fair play and substantial justice. *See, e.g., International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160. To ensure achievement of this goal, the machinery of jurisdictional analysis is designed to refine judges' intuitions about the relevant equities, not to eliminate those equities from the decisional process. Relatedness and purposeful availment are cogs in this analytic machinery. The gestalt factors comprise the machinery's fail-safe device; they are not a necessary part of the machinery's day-to-day operation, but if, in the course of a particularized analysis, the gears mesh imperfectly because a given set of facts does not fit into any of the standard molds, the gestalt factors take hold.

This case exemplifies the proper operation of the fail-safe device. It hardly seems fair, on the strength of a single remark uttered in the course of a single unsolicited telephone call from a Massachusetts-based journalist, to compel a California resident to defend a tort suit in a court 3000 miles away. The unfairness is heightened because the link between the remark and the injury has been attenuated by republication in the popular press. Our commitment to fair play and substantial justice precludes us from subjecting a person to the rigors of long-distance litigation on the basis of so gossamer a showing of causation and voluntariness.

We need go no further. When all is said and done, courts must assert jurisdiction, or abjure its assertion, with an eye toward fundamental fairness. Thus, here, the district court's dismissal of the instant action for want of *in personam* jurisdiction must be

***Affirmed.***